IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NICHOLAS VASQUEZ, II,

                Petitioner,

      vs.

SCOTT FRAUENHEIM, Warden, Pleasant
Valley State Prison,[1]

          Respondent.

No. 2:13-cv-01497-JKS

MEMORANDUM DECISION

Nicholas Vasquez, II, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Vasquez is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Pleasant Valley State Prison.  Respondent has answered, and Vasquez has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On August 6, 2009, Vasquez was charged with one count of assault with a firearm.  The information further alleged that Vasquez personally used a firearm and that he had suffered a prior strike conviction and a prior serious felony conviction.

On direct appeal of his conviction, the California Court of Appeal recounted the following facts underlying Vasquez's case:

>Michelle Ralston lived in the city of Rio Vista, near the corner of St. Francis Way and Virginia Drive.  On April 26, 2009, her friend Jacob Jackson came over to do some work in Ralston's front yard.  As she was cooking dinner, Ralston heard what sounded like three gunshots.  Jackson ran inside the house and said that "Nico" had shot at him. Ralston called 911.

---

[1]     Scott Frauenheim, Warden, Pleasant Valley State Prison, is substituted for G. Swarthout, former Warden, California State Prison, Solano.  FED. R. CIV. P. 25(c).

Jackson had been working outside when he saw [Vasquez] drive by in a silver Mitsubishi.  He had met [Vasquez] a few times before and knew him only as "Nico." The two men had a "beef" because a woman Jackson was dating told him she had awakened one night to find [Vasquez] in her room and her pajama bottoms pulled down. Jackson thought this woman was unstable, and he did not necessarily believe her story. Nevertheless, Jackson yelled at [Vasquez] to pull over when he saw him drive by and told him he was going to "kick his ass."

According to Jackson, [Vasquez] drove by a few times before finally stopping the car and getting out.  Jackson picked up a baseball bat, intending to hurt (but not kill) [Vasquez], but then noticed [Vasquez] was carrying a handgun.  Jackson dropped the bat and ran, diving behind some bushes next to the house at 423 St. Francis Way.  He heard gunshots and continued to lie behind the bushes until he heard [Vasquez's] car drive away.  The neighbor at 423 St. Francis Way, a Mr. Griffin, came outside and "exchanged words" with Jackson about the incident.  Jackson then ran inside Ralston's house and waited while she telephoned the police.

Glenn Myer and his family were driving through the area in a Chevy Tahoe and stopped at the intersection of Virginia Drive and St. Francis Way.  Myer saw a man running across the yard at 423 St. Francis Way, being chased by [Vasquez].  [Vasquez] raised his hand and fired several shots from a handgun that appeared to be a revolver. [Vasquez] then got into a light silver car parked on the street and drove down St. Francis Way, proceeding to Highway 12 via Laurel Street.

Myer, who worked for the District Attorney as an investigator and had previously been a patrol sergeant with the Rio Vista Police Department, followed [Vasquez's] car. Because his family was with him, he did not follow as closely as he ordinarily would, but he did get a partial license plate number, "4PGH."  Myer radioed the dispatch centers in Solano and Contra Costa Counties with a report of the shooting and description of the car.  He continued to follow at a distance of three to four car lengths; it was easier to see the car at some times than at others.

[Vasquez] turned onto Highway 160, a two-lane highway with waterways alongside it, and a truck towing a boat got between Myer's vehicle and [Vasquez's] car. [Vasquez's] car was stopped by law enforcement agents on Highway 160 and Myer stopped to assist.  No gun was found in [Vasquez's] car, which turned out to be a Mitsubishi.[FN1]  Myer identified [Vasquez] at trial as the man who had fired the weapon and who was detained when the Mitsubishi was stopped.  The Mitsubishi was the same car that Myer had seen being driven away from St. Francis Way after the shooting.

FN1. In Myer's opinion, the Mitsubishi resembled a Honda.  Before the car was stopped, Myer had described it as a silver "Honda-stylish" vehicle.

On the day following [Vasquez's] detention, Officer Pratt of the Rio Vista Police Department went to 423 St. Francis Way to investigate the shooting.  Officer Pratt had been a member of the police SWAT team and had "done years of shooting."  He found three small holes in the east wall of the residence and concluded, based on his training and experience, that they were consistent with bullet holes.  In Pratt's opinion, the

2

position of the bullet holes and their likely trajectory suggested that they had been fired
from the location where the shooter in this case was reported to have been standing. A
bullet was recovered from one of the holes.

Joette Doner, who lived in the neighborhood on Laurel Way, heard three gunshots
one evening in late April 2009. She went outside and saw a grayish car that she
identified as a Honda speed by, followed by a dark blue Chevy Tahoe, both heading
toward Highway 12. Doner recognized the first car as a Honda due to its logo. When, at
trial, Doner was shown a picture of the car [Vasquez] was driving when he was stopped
by law enforcement on Highway 160, she said it was not the same as the Honda she saw
driving down her street, because the car in the picture looked older and wider.

*People v. Vasquez*, No. A129569, 2012 WL 213437, at *1-2 (Cal. Ct. App. Jan. 25, 2012).

Jury selection began on July 7, 2010. During the jury selection process, Vasquez made
two separate *Batson/Wheeler*[2] motions that the trial court denied. The jury was sworn that day
and the trial commenced. The following day, the trial ended, and the jury found Vasquez guilty
of assault with a firearm and also found true the personal use of a firearm enhancement.

On July 9, 2010, Vasquez waived his right to a jury trial on the prior offense, and the trial
court found true that allegation. On August 6, 2010, the trial court sentenced Vasquez to an
imprisonment term of 3 years, doubled to 6 years as a second strike, for the assault with a
firearm conviction and an imprisonment term of 4 years for the gun enhancement. The court
also imposed a 5-year enhancement based on Vasquez's prior strike offense, resulting in a total
sentence of 15 years in prison.

Through counsel, Vasquez appealed his conviction, arguing that: 1) the prosecution used
peremptory challenges to strike Hispanic jurors in violation of his state and federal constitutional

---

[2]    *Batson v. Kentucky*, 476 U.S. 79 (1986) (a shorthand reference to the procedure
under which a prosecutor's peremptory strikes of potential jurors are challenged on the basis that
the strikes are being made on a discriminatory basis, i.e., because they are members of an
identifiable group distinguished on racial, religious, ethnic, or similar grounds); *People v.
Wheeler*, 583 P.2d 748 (Cal. 1978) (the California counterpart to *Batson*).

3

rights; 2) the trial court erred in admitting opinion testimony about the origin and nature of holes found in the wall of 423 St. Francis Way; 3) the trial court erred in admitting hearsay testimony that violated its earlier *in limine* ruling; 4) trial counsel was ineffective for failing to object to the admission of improper character evidence; and 5) the trial court erred in instructing the jury on reasonable doubt. The Court of Appeal affirmed Vasquez's conviction in an unpublished, reasoned opinion issued on January 25, 2012. *Vasquez*, 2012 WL 213437, at *11. Vasquez petitioned to the California Supreme Court for review, raising his claims that the trial court erred in instructing the jury on reasonable doubt, the prosecution used its peremptory challenges to strike Hispanic jurors, and his counsel was ineffective for failing to object to the admission of improper character evidence. The petition was summarily denied on April 20, 2012.

Vasquez timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on July 2, 2013.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Vasquez asserts three grounds for relief, raising the same claims he raised to the California Supreme Court in his petition for review of the Court of Appeal's decision affirming his conviction. First, he argues that the trial court erroneously instructed the jury on the applicable burden of proof when it compared the reasonable doubt standard to a jigsaw puzzle. He additionally contends that the trial court violated his constitutional rights when it failed to examine the prosecutor's proffered reasons for excluding Hispanic potential jurors from the jury pool. Finally, he asserts that his trial counsel was ineffective for failing to object to prejudicial character evidence. Vasquez further requests an evidentiary hearing as well as a copy of the transcripts from the state court proceedings.

4

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Vasquez has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

Claim 1: Instructional Error

Vasquez first argues that the trial court's attempt to explain the burden of reasonable doubt by comparing it to putting together a jigsaw puzzle was "extremely problematic" because "[t]he trial court essentially told the jury some of the evidence was important and should be considered, while other 'pieces' were not important and should be disregarded as such when assessing whether reasonable doubt existed."

When addressing this claim on direct appeal, the Court of Appeal recounted the following facts:

> During its initial comments to the jury panel during voir dire, the court used a jigsaw puzzle analogy to illustrate the concept of proof beyond a reasonable doubt. [Vasquez] argues that these comments amounted to structural error requiring reversal, because they diluted the People's burden of proof. We are not persuaded.
> The court began its discussion of reasonable doubt by reading the jury panel a paragraph from CALCRIM No. 220: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." The court continued, ". . . As an example of this, I like to imagine—or ask jurors to imagine that they have two small puzzles to put together and to identify the picture once they complete their task. In my example, in each of these puzzles is a picture of an individual. [¶] In the first of my examples, you put the puzzle together, and you find that there are three or four pieces missing. Now, you might look at—now, in this case, they're missing around the edges or other places that are not really important or pertinent to your identification. You might look at the puzzle and say 'well, it's not all there, and I have a doubt.' Well, in my opinion, it must be a possible or imaginary doubt, rather than reasonable doubt. [¶] In the second of my examples, you put the second puzzle together, and you find the same number of pieces missing, three or four, only in this case they are missing around the eyes or other places that are important to your identification. Now, if you look at this picture, and you do not have an abiding conviction that your identification is accurate, or proved, then you would have a reasonable doubt."

*Vasquez*, 2012 WL 213437, at *9.

The appellate court rejected the claim, concluding that, "[a]lthough both courts and prosecutors are well-advised to refrain from embellishing on the statutory definition of reasonable doubt, it is not reasonably likely the jurors applied the jigsaw puzzle analogy in this case to lessen the prosecution's burden of proof." *Id.* at *11 (internal citation omitted).  In support of its conclusion, the appellate court noted that the trial court "made clear that reasonable doubt would exist when pieces were missing from the picture itself" and "in no way suggested that the jury should speculate about missing pieces of evidence" or "attempt to quantify the burden of proof by suggesting, either directly or indirectly, that any particular percentage of pieces were sufficient to complete the puzzle." *Id.* at *10.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  The United States Supreme Court has held that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (internal citation, quotation marks, and brackets omitted).  A jury instruction that reduces the level of proof necessary for the Government to carry its burden "is plainly inconsistent with the constitutionally rooted presumption of innocence." *Cool v. United States*, 409 U.S. 100, 104 (1972).  However, [a]ll challenged instructions must be considered in light of all of the jury instructions and the trial record as a whole." *Mendez v. Knowles*, 556 F.3d 757, 768 (9th Cir. 2009) (citing *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)).

In this case, the state appellate court reasonably concluded that the trial judge's analogy to a jigsaw puzzle could not have been misunderstood by the jury so as to reduce the prosecution's burden.  The analogy did not suggest that the prosecution's burden was anything less than reasonable doubt nor did it, as Vasquez maintains, suggest disregarding evidence. Rather, the analogy informed the jury that the prosecution must still carry its burden of proving Vasquez guilty beyond a reasonable doubt.

Moreover, as the appellate court noted, the challenged comments were made by the trial court during voir dire.  *Vasquez*, 2012 WL 213437, at *10.  Once the venire was empaneled and before the jury began deliberations, "the jury that was impaneled to try [Vasquez's] case was instructed with CALCRIM No. 220, which fully and correctly defined the standard of proof beyond a reasonable doubt."  *Id.*; *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").  The court did not reiterate the puzzle analogy prior to jury deliberations.  *Vasquez*, 2012 WL 213437, at *10.  Vasquez complains, however, that the "prosecutor referenced the puzzle analogy during closing arguments without a contradicting comment from the trial court."  But Vasquez fails to establish that the prosecutor's statement, which suggested that the prosecution had met its burden of proof, was improper because it was simply argument, and the jury was instructed that "[n]othing that the attorneys say is evidence." *See Boyde v. California*, 494 U.S. 370, 384-85 (1990) (arguments of counsel generally carry less weight with jury than instructions from the court; the arguments are described in advance to jury as matters of argument, not evidence); *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (prosecutor did not commit misconduct by asking the jury to draw reasonable inferences based on the evidence presented at trial).  In light of the instructions as a whole, any possible erroneous

statement made during voir dire could not have had a substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  Accordingly, the state court's rejection of Vasquez's claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and Vasquez is not entitled to relief on this claim.

Claim 2: *Batson/Wheeler* Challenges

Vasquez next argues that the prosecutor improperly used two peremptory challenges for discriminatory reasons.  He complains that "the trial court did not make any effort to examine the prosecutor's stated reasons; it simply accepted them on their face."  He suggests that the Court of Appeal's decision upholding the trial court's denial of his *Batson/Wheeler* motions was unreasonable or contrary to federal law because the appellate court "similarly accepted the prosecutor's stated reasons without addressing [Vasquez's] concerns that the trial court did not carry out a step three analysis."

The record before this Court does not clearly indicate the racial makeup of the jury that was empaneled.  Vasquez argued on direct appeal that the jury pool consisted of 28 people, 5 of whom appeared to have Hispanic surnames.  During voir dire, the prosecutor exercised four peremptory challenges.  Vasquez argued that the prosecutor improperly used two of those peremptory challenges to challenge two jurors who appeared to have Hispanic surnames.

The Court of Appeal described the following facts underlying this claim:

> The *Batson/Wheeler* issue in this case arises from the prosecutor's challenge of two Hispanic or Hispanic-surnamed jurors, Juror S. and Juror C.
> Juror S. stated in her written questionnaire that she had a bachelor's degree in chemical engineering and worked as a chemist for Lockheed Martin.  During voir dire, the prosecutor commented that she had been "extremely quiet" and asked her about her job.  Juror S. explained that she was an "interpreter for environmental protection agencies" and that they "finalize environmental shops."

10

Juror C. stated in her questionnaire that she worked at a cashier for Vella Cheese and had previously worked at a Six Flags amusement park. She was questioned by the prosecutor during voir dire: "[Prosecutor]: You look a little nervous sitting over there today. Are you nervous about being up there on the spot right now? [¶] [Prospective Juror C.]: (No response.) [¶] [Prosecutor]: A little bit? [¶] [Prospective Juror C.]: A little bit, yeah. [¶] [Prosecutor]: Have you ever known anyone involved in a criminal case? [¶] [Prospective Juror C.]: Yes. [¶] [Prosecutor]: Who was that? [¶] [Prospective Juror C.]: Just classmates. [¶] [Prosecutor]: Friends? [¶] [Prospective Juror C.]: Yes. [¶] [Prosecutor]: Anything about those experiences that cause you concern about sitting on a jury? [¶] [Prospective Juror C.]: No. [¶] [Prosecutor]: When you were working over at Six Flags, were you ever the victim of a crime or anything like that? They get a lot of robberies and such over there, I take it. [¶] [Prospective Juror C.]: Yeah. [¶] [Prosecutor]: Okay. Any concerns about the type of case, that this is a shooting case, the type of crime? [¶] [Prospective Juror C.]: No. [¶] [Prosecutor]: Okay. You think you'll be able to talk to these 11 strangers if you go back in the room and talk about the case? [¶] [Prospective Juror C.]: I think so."

The prosecutor used her first peremptory challenge to excuse Juror S., and defense counsel made a *Batson/Wheeler* motion, noting that the juror appeared to be Hispanic and that [Vasquez], who is apparently Hispanic, "has a right to have a jury composed of his peers." The court turned to the prosecutor for a response, who stated, "Well, first of all, I think she appeared to be of Filipino descent, but that was neither here nor there. [¶] I excused her because she's a chemist, and so she has a scientific background. There is not going to be any scientific evidence, and I don't need a juror in the back trying to evaluate scientific evidence that isn't present or the lack thereof in determining the guilt or not guilt [sic] of the defendant." The court found that explanation to be reasonable and denied the *Batson/Wheeler* motion.

The prosecutor used her third peremptory challenge to excuse Juror C., and defense counsel made another *Batson/Wheeler* motion, noting that Juror C. also appeared to be Hispanic or of Hispanic descent. The prosecutor stated, "Ms. [C.] is extremely young. I don't know what her nationality is. She has very little life experience, and she was extremely shy, even in answering questions with me, and so I had concerns about her ability to deliberate, have her own opinion, and follow the laws of the Court." Defense counsel commented that there were "several young people" who were part of the jury pool and that most of them had been relatively shy about bringing up information about themselves. The court denied the motion, stating that it could not determine Juror C.'s ethnic origin, but she did appear to be "nervous and inexperienced"—a satisfactory reason for a peremptory challenge.

*Vasquez,* 2012 WL 213437, at *3.

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of the jury. *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). In *Batson*, the Supreme Court outlined a

three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause: 1) a defendant raising a *Batson* claim must establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor; 3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if the defendant has established purposeful discrimination.  *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" regarding *Batson* claims that "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).  Under the AEDPA, a federal habeas court may only grant relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge."  *Rice v. Collins*, 546 U.S. 333, 338 (2006).  This "standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial evidence, we must uphold it."  *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012).

Here the parties do not dispute the state court's conclusion at step one of the *Batson* analysis that Vasquez established a *prima facie* case that each peremptory strike was based on race or that the prosecutor produced a race-neutral explanation for dismissing each potential juror at step two.  The issue presented in Vasquez's Petition is whether the state court's determination at step three, that the prosecutor did not engage in purposeful discrimination, was

12

an unreasonable determination pursuant to 28 U.S.C. § 2254(d)(2) of the facts in light of the

evidence presented in the state court proceedings.

Although the record indicates that the trial court gave only brief statements when

accepting the prosecutor's proffered reasons, on direct appeal, the Court of Appeal undertook a

lengthy analysis of Vasquez's claim before ultimately rejecting it:

> Substantial evidence supports the court's ruling in this case. The prosecutor
> explained that she excused Juror S. because Juror S. was a scientist who might be
> inclined to wonder about the People's case if no scientific evidence was presented. A
> prosecutor may challenge a potential juror whose occupation, in the prosecutor's
> subjective estimation, would not render him or her the best type of juror to sit on the case
> for which the jury is being selected.
>
> [Vasquez] argues that the prosecutor's reason for excusing Juror S. could not
> have been genuine because she left others with scientific backgrounds on the jury. We
> are not persuaded. The jurors to which [Vasquez] compares Juror S. had backgrounds in
> nursing, health and safety technology, information technology/aeronautics, hospital
> billing and veterinary science. These professions do not require the same type of
> scientific knowledge and methodology associated with chemical engineering, and the
> prosecutor's decision to leave these other jurors on the panel does not suggest that her
> stated reason for excluding Juror S. was pretextual.
>
> [Vasquez] argues that the prosecutor could not have been sincere when she said
> her case would not involve scientific evidence because she introduced Officer Pratt's
> testimony about the bullet holes found at the scene. Pratt's testimony about the bullet
> holes, though based on his experience in handling firearms, did not cross over into the
> realm of "scientific testimony." The record does not suggest the prosecutor was being
> disingenuous when she said she was concerned about Juror S. given the lack of scientific
> evidence in this case.
>
> We also reject the claim that the trial court erred in upholding the peremptory
> challenge to Juror C. The prosecutor explained that she found Juror C. to be youthful,
> shy and inexperienced, which raised a concern about her ability to effectively deliberate
> and express her views. The court agreed that the juror seemed "nervous and
> inexperienced." Limited life experience and immaturity are neutral reasons supporting a
> peremptory challenge. So too is a nervous demeanor. [Vasquez] notes that other
> panelists were described as "quiet" (including Juror S., the subject of the first
> *Batson/Wheeler* challenge), but a reasonable reading of the trial transcript is that Juror C.
> was the only one who was too nervous to even respond to the prosecutor's first question.
>
> Substantial evidence supports the trial court's denial of the two *Batson/Wheeler*
> motions.

*Vasquez*, 2012 WL 213437, at *4-5 (internal citations, quotation marks, and footnote omitted).

That analysis survives deferential federal habeas scrutiny.  The state courts did not

unreasonably apply *Batson* or its progeny in exploring and evaluating the prosecutor's conduct.

Based on the record before this Court, there is no basis to find that the state court's denial of

Vasquez's *Batson* claim was unreasonable, and Vasquez is not entitled to relief on this ground.

<u>Claim 3: Ineffective Assistance of Counsel</u>

Finally, Vasquez asserts that his trial counsel was ineffective for failing to object to the

admission of improper character evidence.  At trial, Jackson testified that he challenged Vasquez

to a fight when he saw him driving by because, "I was going out with this girl, and she's pretty

much mentally unstable, but she told me that one night he was there, that she woke up, and he

had her pajama bottoms down to her knees—so I reacted to that."  *Vasquez*, 2012 WL 213437, at

\*7.  When asked by the prosecutor whether he believed her account, Jackson explained, "I didn't

quite believe it, but I didn't want to say she was lying."  *Id.*  On appeal, Vasquez argued that

Jackson's testimony was inadmissible character evidence that should have been excluded under

Evidence Code § 1101(a)[3] and that his trial counsel's failure to object deprived him of

ineffective assistance of counsel.  *Id.*

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a

defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one

in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

---

[3]       That section provides, in relevant part, that "evidence of a person's character or a
trait of his or her character (whether in the form of an opinion, evidence of reputation, or
evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or
her conduct on a specified occasion."  CAL. EVID. CODE § 1101(a).

guaranteed by the Sixth Amendment." *Id.*  The Supreme Court has explained that, if there is a

reasonable probability that the outcome might have been different as a result of a legal error, the

defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376,

1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at

393-95.  Thus, Vasquez must show that his trial counsel's representation was not within the

range of competence demanded of attorneys in criminal cases, and that there is a reasonable

probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill

v. Lockhart,* 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make

a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697

(courts may consider either prong of the test first and need not address both prongs if the

defendant fails on one).  In reviewing ineffective assistance of counsel claims in a federal habeas

proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And,
> because the *Strickland* standard is a general standard, a state court has even more
> latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.

Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Vasquez's claim that his attorney rendered ineffective assistance based on Jackson's

testimony is unavailing.  As the Court of Appeal concluded in rejecting Vasquez's claim,

"[e]vidence that Jackson's girlfriend had told Jackson about possible sexual misconduct by

[Vasquez] was not offered to prove [his] conduct in this case, but to explain Jackson's decision

to challenge [Vasquez] to a fight." *Vasquez*, 2012 WL 213437, at *8.  As such, Jackson's

testimony was properly admitted.  Trial counsel therefore was not ineffective in failing to object

to testimony that was proper under California law and did not violate his right to due process.

*See, e.g., James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (citing *Morrison v. Estelle*, 981 F.2d 425,

429 (9th Cir. 1992) (the failure to make a futile objection does not constitute ineffective

assistance of counsel).

   Moreover, as the appellate court further concluded, defense counsel may have been

acting in accordance with a rational tactical choice not to move to strike the testimony in light of

the fact that Jackson indicated that he did not believe it himself:

> Defense counsel might have rationally concluded that there was no point
> objecting to the evidence about the story told by Jackson's girlfriend when it was clear
> that Jackson did not necessarily believe it himself.  Indeed, Jackson's claim that he
> challenged [Vasquez] to a fight and armed himself with a baseball bat, even though he
> was unconvinced [Vasquez] had actually done what his girlfriend claimed, reflected
> poorly on Jackson's character, credibility and judgment.  Under the circumstances,
> defense counsel might have concluded that the testimony hurt Jackson's credibility more
> than it did [Vasquez's] case, and that it would make the jury less likely to believe
> Jackson's testimony about the shooting.

*Vasquez*, 2012 WL 213437, at *8.

   The record indicates that on Vasquez's counsel had the witness reiterate through cross-

examination that he did not believe his girlfriend's story and also attempted to further damage

the witness's credibility:

| [Defense Counsel:] | . . . And you said the dispute was over what—what an ex-girlfriend had told you, correct? |
|---|---|
| [Jackson:] | Correct. |
| [Defense Counsel:] | And you told us today she may have been mentally unstable, and you may not have believed everything, but you were angry? |
| [Jackson:] | Right. |
| [Defense Counsel:] | And did you ever tell Officer Rister that she was mentally unstable? |

| | |
|---|---|
| [Jackson:] | Yeah. |
| [Defense Counsel:] | You did tell her that? |
| [Jackson:] | Yeah, I believe I did.  I don't recall really too much.  I mean, this happened over a year ago, and I was on a lot of drugs back then, so I don't really recall too much of what was said then. |
| [Defense Counsel:] | Okay.  So you don't know if you told that to the officer or not? |
| [Jackson:] | Well, she was known to the police [as] also having a mental illness, so I don't know if I said it or whatnot . . . . |

It was defense counsel's reasonable tactical decision to present the issue to the jury in such a way rather than objecting to Jackson's testimony on direct examination.  *See Furman v. Wood*, 190 F.3d 1002, 1007 (9th Cir. 1999) (upholding state court determination that counsel's decision to address issue on redirect was tactical); *see also Alcaraz v. Giurbino*, No. 05-cv-1597, 2010 WL 3582938, at *15-16 (E.D. Cal. Sept. 9, 2010) (finding counsel's decision not to object to unfavorable testimony on direct examination but instead inquire further with the witness on cross-examination was a reasonable tactical decision not constituting deficient performance).

Furthermore, Vasquez cannot demonstrate that he was prejudiced by his counsel's failure to object to Jackson's testimony.  Given the strength of the evidence against Vasquez, including eyewitness accounts, and the weakness of the alleged character evidence, as discussed above, it is not reasonably likely that the outcome of the trial would have been different had defense counsel objected to the challenged portion of Jackson's testimony.  Accordingly, the California court's rejection of Vasquez's ineffective assistance claim did not contravene or unreasonably apply federal law, and habeas relief is not warranted on this claim.

Requests for an Evidentiary Hearing and Transcripts

Vasquez further claims that, "[a]lternatively, . . . he is entitled to an evidentiary hearing to further develop the issue that he did not receive the effective representation of counsel during his trial."  Vasquez fails, however, to specify what evidence he wishes to present for the claim. A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963).  *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005).  In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.  *Id.* at 670

18

(quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

As discussed above, Vasquez has failed to assert a colorable claim for relief as to his ineffective assistance of counsel claim.  Because he does not cite to new laws or underlying facts that were not developed on the record before the state courts, he also has failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2).  Accordingly, Vasquez's request for an evidentiary hearing also must be denied.

Vasquez additionally "requests this Court order Respondent to provide him with the court transcripts."  He cites to no authority requiring Respondent to serve him with a copy of the documents lodged in this case and this Court is unaware of any.  *See Foss v. Martel*, No. 09-cv-3551, 2011 WL 2414512, at *2-3 (E.D. Cal. June 10, 2011) (denying petitioner's request that respondent serve the record upon him).

Section 2250 of the United States Code provides: "If on any application for a writ of habeas corpus an order has been made permitting the petitioner to prosecute the application in forma pauperis, the clerk of any court of the United States shall furnish to the petitioner without cost certified copies of such documents or parts of the record on file in his office as may be required by order of the judge before whom the application is pending."  28 U.S.C. § 2250.  The record in this case establishes that Vasquez was granted in forma pauperis status on August 29, 2013.  Docket No. 8.  A § 2250 request "rests within the discretion of the judge presiding in the case" who may decide what, if any, copies should be provided to an indigent habeas petition.  *See Foss*, 2011 WL 2414512, at *3.

Vasquez contends that the documents are necessary "to competently argue and present responsive pleadings to the state's anticipated challenge" to his Petition.  Vasquez has not filed a Traverse, but the time to do so has long since expired.  Vasquez therefore cannot need the documents for his originally-stated purpose.  However, in an abundance of caution, the Court will, pursuant to 28 U.S.C. § 2250, order the Clerk of Court to furnish Vasquez a copy of the documents Respondent lodged in this matter in order to assist him in requesting a certificate of appealability ("COA") from the Ninth Circuit Court of Appeals.

## V. CONCLUSION AND ORDER

Vasquez is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request for an evidentiary hearing is denied.

**IT IS FURTHER ORDERED THAT** the Clerk of Court shall provide Vasquez without cost a copy the documents Respondent lodged in this matter.  *See* 28 U.S.C. § 2250.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a COA.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,  537 U.S. at 327)).

Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit

Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

   The Clerk of the Court is to enter judgment accordingly.

   Dated: August 26, 2014.

                                                      /s/James K. Singleton, Jr.
                                                   JAMES K. SINGLETON, JR.
                                                   Senior United States District Judge